1

2

3

4

5

6

7

8             **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    JOE NATHAN TAYLOR,                    No.  2:18-CV-0149-JAM-DMC-P

12                 Plaintiff,

13          v.                              FINDINGS AND RECOMMENDATIONS

14    J. MA,

15                 Defendant.

16

17          Plaintiff, a prisoner proceeding pro se, brings this civil rights action under 42

18    U.S.C. § 1983. Pending before the Court is Defendant's unopposed motion for summary

19    judgment, ECF No. 38. The undersigned United States Magistrate Judge recommends granting

20    Defendant's motion.

21    / / /

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

1

**I. PLAINTIFF'S ALLEGATIONS**

2      According to the operative first amended complaint, Plaintiff is an inmate at

3  California State Prison – Sacramento (CSP-Sac) and the events giving rise to this complaint

4  occurred at CSP-Sac. ECF No. 12, page 1. J. Ma, a primary care physician employed at CSP-Sac,

5  is the sole remaining Defendant.

6      Plaintiff claims he previously underwent an "arthroscopic knee surgery" in 2002

7  that removed cartilage from within Plaintiff's knee and causes the bones to painfully grind

8  together. See id. at 4, 13. Plaintiff describes his pain as "excessive grating and loud hurtful

9  popping" of the knee joint, necessitating careful movement to avoid temporary pain. Id. at 7.

10  Plaintiff allegedly also suffers from spinal and degenerative arthritis that Plaintiff describes as

11  pain and stiffness in his neck, upper back and shoulders, as well as numbness in both hands. Id. at

12  5. Plaintiff claims his pain prevents him from sleeping, performing daily functions, and working.

13  Id. at 2. Allegedly, Defendant Ma's treatments included limiting "walking; standing; stooping;

14  and going up [and] down stairs," wearing a knee brace on Plaintiff's left knee and orthopedic

15  shoes, and using a walking cane for five months. Id. at 5, 8. A different doctor, J. Wedell,

16  determined Plaintiff needed a steroid injection. Id. at 6. After this shot, Plaintiff claims he had

17  "his left knee drained of fluids twice and two more steroid injections performed by Dr. Ma." Id.

18  Plaintiff asserts this proves Ma's knowledge "that Plaintiffs injury and his pain is significant and

19  needs protection." Id. at 7.

20      Defendant, according to the complaint, purposefully lied that Plaintiff was on

21  Methadone to cope with Plaintiff's pain before using Tramadol. Id. at 6. Plaintiff asserts he never

22  took Methadone and never showed any side effects from taking Tramadol that justified

23  discontinuing its use. Id. at 6-7. Plaintiff claims that when Ma took Plaintiff off Tramadol and

24  proscribed Ibuprofen, the lack of pain relief caused Plaintiff to take Ibuprofen in larger doses. Id.

25  at 7. Plaintiff alleges that the daily five to six 400 mg doses of Ibuprofen medication Plaintiff is

26  now taking is adversely affecting his gastrointestinal tract. Id. at 8-9. Plaintiff alleges he acquires

27  the Ibuprofen "if he is able to make it to the prison canteen" and "if he doesn't make it then there

28  exist no relief at all and no treatment." Id. at 8. In conclusion, Plaintiff alleges that his medical

2

1 issues and debilitating condition are a result of the arthroscopic surgery and Ma has failed to

2 provide adequate medical relief. Id. 7-8.

3

4                                  **II. THE PARTIES' EVIDENCE**

5              Defendant supports his motion for summary judgment with a Statement of

6 Undisputed Facts with references to attached evidence. ECF No. 38-2. According to the

7 Defendant, the followings facts are undisputed:

8              1.      Plaintiff Joe Taylor (D-86762) is a state prisoner currently
housed at California State Prison – Sacramento (CSP-Sac), where he was
9 also housed at the time of the alleged events. (Defendant's Exhibit A,
declaration of A. Crawford and documents from Plaintiff's central file
10 (DX A, p. 1.))

11             2.      Defendant Ma is a physician employed by the California
Department of Corrections and Rehabilitation, who worked at California
12 State Prison – Sacramento. (First Amended Complaint, § B.)

13             3.      Plaintiff has chronic knee pain, intermittent back pain and
shoulder pain. (Defendant's Exhibit B, declaration of K. Bliss and
14 documents from Plaintiff's medical file (DX B, p. 3.))

15             4.      Plaintiff's medical record indicates that he had arthroscopic
knee surgery in 2002, that there was a time his pain appeared worse and
16 was put on Methadone between August 2011 and June 2012. (DX B, p. 3.)
Plaintiff's was prescribed Tramadol for his back pain. (DX B, p. 5.)
17
            5.      Tramadol is a short acting opioid and is used to treat
18 moderate to severe pain in adults. [(Defendant's Exhibit C, Pain
Management Guidelines](DX C, p. 14.))
19
            6.      In 2009, the State of California Prison Health Care Services
20 published a Pain Management Guideline to standardize the evaluation and
treatment of pain within the California Prison Health Care Services
21 system. (DX C.) Under the Health Care Services Pain Management
Guidelines, Tramadol is a non-formulary drug and chronic use is not
22 recommended for chronic pain. (DX C.) Short term use of Tramadol may
be considered for patients not responsive to Tylenol #3 (acetaminophen
23 and codeine). (Id.)

24             7.      Narcotics are disfavored for long term treatment of non-
cancer pain, even in patients without a history of abuse. (DX C, p. 1.)
25 There is little evidence supporting the long-term use of opiates for chronic
muscle and joint pain, and at the same time there is increasing awareness
26 that opioids are subject to abuse. (DX C, p. 1.)

27 ///

28 ///

8.      For chronic pain treatment, the focus is on increasing the patient's function. (DX C, p. 2, 5, 7.) The overriding message to the patient is that nothing is likely to take away all of their pain. (DX C, p. 2-7.)

9.      Plaintiff was evaluated by Dr. Ma on April 23, 2014 for complaints of left knee pain. (DX B, p. 3-4.) Plaintiff complained of worsening pain and stated that he had not be able to work out that much due to the pain. Plaintiff was on a number of medications including Aspirin, 81 mg daily once a day and Tramadol, 100 mg twice a day. Dr. Ma believed the knee pain was from arthritis and explained to Plaintiff about the nature of his knee condition. Dr. Ma believed that nonsteroidal anti-inflammatory medication for pain control was a better treatment plan. He told Plaintiff to slow down his weight bearing exercise. Dr. Ma also offered a job modification, which Plaintiff declined. (DX B, p. 4.)

10.     As a result of that evaluation, Dr. Ma ordered an x-ray of Plaintiff's left knee. (DX B, p. 4.)

11.     The x-ray study showed a joint effusion without acute osseous injury identified. No fracture or dislocation was seen, and mild degenerative changes were present. (DX B, p. 5.)

12.     On July 9, 2014, Plaintiff was seen by Dr. Ma again for knee pain. Dr. Ma had previously evaluated Plaintiff's left knee, and in the most recent evaluation did not see any signs of meniscus tear or ligament tear. Dr. Ma did not see any signs of an operable condition and therefore no indication for a MRI or Orthopedic Surgeon consult was ordered. (DX B, p. 7.)

13.     Plaintiff's job was noted as a tier tender which involved frequent and repetitive walking up and down stairs. Dr. Ma told Plaintiff to modify his activity and ordered a knee brace. (DX B, p. 7.)

14.     Dr. Ma saw the Plaintiff for left knee pain on August 19, 2014. (DX B, p. 9.) Dr. Ma noted active and passive range of motion, which was essentially normal although Plaintiff had some pain when he fully extended and fully flexed his left knee. (Id.) There was crepitus noted in the left knee and also tenderness to palpation along the medical and lateral aspect of Plaintiff's knee. (Id.) The anterior-posterior drawer test, valgus-varus test and Lachman test were normal. The McMurray test was questionably positive. (Id.) Dr. Ma believed Plaintiff's knee issue was caused by some degeneration, with possible internal derangement, and that Plaintiff was a good candidate for a steroid injection. (Id.) Dr. Ma again recommended that Plaintiff quit his job to avoid walking up and down stairs repetitively to avoid irritation to his knee and would update his chrono. (DX B, p. 9-10.)

15.     On October 20, 2014, Plaintiff was seen by Dr. Ma for several medical issues, including his chronic left knee pain. Dr. Ma noted that he previously thought to send Plaintiff for an MRI, but that there was not much clear indication for him to get surgical repair. (DX B, p. 13-14.) Therefore Dr. Ma held off the MRI request and recommended a steroid injection, which was provided by another medical provider. (DX B, pp. 13-14.)

4

16.     Following the steroid injection, Plaintiff stated that his knee pain had subsided and he was happy with the injection result. (DX B, p. 16.) Dr. Ma recommended conservative treatment, including activity modification and intermittent steroid injection, rather than operable pathology. (DX B, p. 13-16.)

17.     On December 24, 2014, Plaintiff was seen for a follow up on his left knee pain and for an eye issue. (DX B, p. 16.) The medical progress note indicates Plaintiff had arthroscopic surgery back in 2002, and that a previous x-ray showed significant osteoarthritis involving the left knee. Dr. Ma recommended that Plaintiff get another aspiration and steroid injection. (Id.)

18.     On January 6, 2015, Dr. Ma performed a left knee intra-articular steroid injection for Plaintiff's chronic knee pain. (DX B, p. 18.) Dr. Ma again noted that Plaintiff had a history of left knee surgery in 2002 for meniscus pathology, but felt another injection would provide another period of pain relief. Dr. Ma also discussed alternative options with Plaintiff. (Id.) Dr. Ma also cautioned Plaintiff about his weight-bearing activities, and told him to notify medical if Plaintiff felt the pain getting worse or noticed swelling or redness. (Id.)

19.     On February 20, 2015, Dr. Ma saw Plaintiff for a follow-up from offsite specialty consult. (DX B, p. 21.) It appeared that the transport was a mistake, as Plaintiff was seen by an Ophthalmologist on January 13, 2015. Otherwise, Plaintiff had no complaints. (Id.)

20.     On April 16, 2015, Dr. Ma saw Plaintiff for, among other things, chronic bilateral knee pain. Plaintiff complained the pain was worse on the left side in the past several months. (DX B. p. 22-23.) Plaintiff also complained of chronic back pain. (Id.) Dr. Ma noted that he had performed a steroid injection a couple of months prior, which achieved pain relief, but now Plaintiff was stating he felt weak in the left knee and was having some knee buckling. (Id.) His prior x-ray showed some degenerative change. His right knee was noted as good. The reported buckling in his knee raised some concern about possible internal derangement, however, Plaintiff's physical examination was essentially normal or insignificant. (Id.) Dr. Ma wrote a request for Plaintiff to get physical therapy to strengthen his quadriceps muscle. He discussed the plan with Plaintiff, and Plaintiff was in agreement. (Id.) As for Plaintiff's back pain, there was no new development and he denied radiation of the pain, therefore, Dr. Ma encouraged Plaintiff to continue stretching. (Id.) Dr. Ma also re-ordered a knee brace for Plaintiff's left knee. (Id.)

21.     Dr. Ma saw Plaintiff the following month on June 19, 2015, for a follow up on his left ankle and laboratory results. (DX B, p. 26-27.) X-rays of Plaintiff's ankle showed no fracture or dislocation. (Id.) During the exam, Dr. Ma noted that Plaintiff was wearing a left knee brace, and recommended that Plaintiff not wear his knee brace in his cell, and elevate his left leg whenever possible. (Id.)

22.     On June 30, 2015, Plaintiff was seen by Physical Therapist L. Herrera for physical therapy for his knee.

23.     Plaintiff went to physical therapy again on July 21, 2015.

5

1

24.     On August 13, 2015, Plaintiff was seen by Dr. Ma for
intermittent left ankle swelling and pain as a result of a sports injury. (DX

2
B, p. 28.) Plaintiff had sprained his ankle and x-rays reported no fracture
or dislocation. (Id.) Plaintiff noted that the swelling became worse after he

3
has been walking or jogging. (Id.) Dr. Ma again advised Plaintiff to stop
his weight-bearing activities for the present, and do gradual weight-

4
bearing in the future. (Id.)

5
25.     On November 2, 2015, Plaintiff was seen by Dr. Ma for
other medical issues. However, Dr. Ma documented Plaintiff's history of

6
chronic bilateral knee pain, but noted that Plaintiff did not complain of his
knee pain on this visit. (DX B, p. 30)

7

26.     On February 9, 2016, Dr. Ma examined Plaintiff for several

8
chronic medical problems, including hypertension, hyperlipidemia and
chronic bilateral knee pain. (DX B, p. 40-41.) During this visit, Plaintiff

9
complained of knee pain, particularly on the left side. (Id.) His
prescription of Tramadol was set to expire in two weeks and Plaintiff

10
requested to be on the medication continuously. (Id.) The objective portion
of the exam noted that he was not in acute distress and walked with a

11
normal gait. (Id.) Plaintiff did have some intermittent swelling and severe
arthritis, and as a result Dr. Ma believed that Tramadol was likely

12
indicated and renewed the medication. (Id.)

13
27.     On April 20, 2016, Dr. Ma saw the patient regarding
complaints of swollen ankles and loss of balance. (DX B, p. 40-41.) He

14
examined Plaintiff, and also requested an MRI for him. (Id.)

15
28.     On May 18, 2016, Plaintiff was seen by Dr. Ma for a
follow up related to a blood pressure issue, laboratory results and

16
dizziness. (DX B, p. 48-49.)

17
29.     On June 27, 2016, Dr. Ma saw Plaintiff for a follow up of
his MRI results. (DX B, p. 51, 53.) Dr. Ma discussed Plaintiff's MRI

18
results which were reported as normal. He also noted that at the time
Plaintiff walked with a normal gait. (DX B, p. 53.)

19

30.     One month later Plaintiff was seen for a chronic care follow

20
up of hypertension, hyperlipidemia, bilateral knee pain and dizziness. (DX
B, p. 56-57.) As to his bilateral knee pain, his pain had been under

21
adequate control and there were no new development. (Id.) Both his
chronic knee pain and back pain were stable, and the plan was to continue

22
him on his current treatment regimen, including Tramadol. (Id.) His
hypertension was well-controlled, hyperlipidemia was normalized and his

23
chronic knee and back pain were stable. (Id.) As to his dizziness, he had a
MRI of the brain that reported as normal. (Id.) He was encouraged to get

24
his vision checked and corrected if indicated. The plan was to monitor him
and he was advised to notify medical if his condition worsened. Further he

25
was scheduled for a six month follow up for his chronic care. (Id.)

26
31.     The medical record indicates the Plaintiff was seen by
another health care provider for a follow up regarding dizziness on

27
September 23, 2016. He reported no recent episodes, and a previous MRI
of his brain and labs were unremarkable. (DX B, p. 61-62.) Plaintiff was

28
referred to optometry. (Id.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32. On November 18, 2016, Plaintiff refused his appointment for a follow up regarding his dizziness. (DX B, p. 67.) His medical record were reviewed, his last visit for dizziness was on September 23, 2016. He had an optometry exam on October 23, 2016 and a new prescription of glasses ordered.

33.     On December 8, 2016, Dr. Ma saw Plaintiff for a follow up regarding a headache, eye pain, and also for a follow up regarding dizziness and syncope. (DX B, p. 70-71.) Dr. Ma previously performed a physical examination on Plaintiff but did not find any explanation for his symptoms. (Id.) An MRI of Plaintiff's brain was done on June 13, 2016, which reported as negative. (DX B, p. 51.)

34.     In July 2016, Dr. Ma had prescribed several different medications for the headaches and dizziness. (DX B, p. 53.) Dr. Ma had previously informed Plaintiff that vision change or incorrect vision acuity could cause or trigger headaches. At the time, Plaintiff was seen by the optometrist and was awaiting eyeglasses. (Id.) Dr. Ma also saw Plaintiff regarding other issues, including his hypertension and hyperlipidemia. Plaintiff's bilateral knee pain was noted as the same and under adequate control with no new development. (DX B, p. 70-71.) As such, the current treatment regimen was continued. (Id.)

35.     On January 27, 2017, Plaintiff was seen for a follow up for his headaches and dizziness. (DX B, p. 72.) The etiology was unclear, he was treated with Augmentin for two weeks for a presumptive diagnosis of sinus infection, which did not seem to provide significant headache improvement. He stated his head is slightly better, since he did not have much yard time, and he believed the antihistamine medication may help a little bit. As part of the objective exam, Dr. Ma noted that he was walking with a normal gait. (Id.)

36. Dr. Ma had requested a refill of Plaintiff's Tramadol, on February 2, 2017, but it was only approved for a two-week refill, as Dr. Ma's supervisor felt there was no clear indication for the medication. (DX B, p. 75.) For this reason, Dr. Ma saw Plaintiff again on February 14, 2017, for a follow up on his chronic pain management and medication. (DX B, p. 76.) Dr. Ma also reeducated Plaintiff on the pain management goal, which was aiming for functionality. (Id.) Dr. Ma explained to Plaintiff that there was no clear clinical research data showing that long term use of opioid medication (such as Tramadol) was beneficial to control chronic non-cancer pain such as his back and knee pain, and that this was the main reason he should be weaned off of Tramadol. (Id.) Plaintiff disagreed with the assessment, so Dr. Ma told him that his case would be presented at the next Pain Management Committee meeting. (Id.) Dr. Ma put in a request to taper Plaintiff off the Tramadol medication. (Id.) The tapering was scheduled to start on February 19, 2017 with a lower dose of 50 mg of Tramadol twice a day for ten days, followed by 50 mg of Tramadol once a day for an additional four days, for a total of two weeks. Dr. Ma expected that the pain management to meet by that time, but they had not. (DX B, p. 85.)

37.     On February 17, 2017, Dr. Ma prescribed Plaintiff Tramadol 50 mg BID for five days. (DX B, p. 81.)

7

38.     On March 3, 2017, Plaintiff saw Dr. Ma for a follow up visit for his chronic pain management. (DX B, p. 85.) Dr. Ma had planned to present Plaintiff's case to the pain management committee in February 2017, but there was no committee that month. (Id.) As a result, Dr. Ma put in another request for approval to continue tapering of Tramadol medication for Plaintiff. (Id.) The request was approved, with an expected tapering of four to six weeks. (Id.)

39.     At the March 3, 2017 visit, Dr. Ma noted that Plaintiff was unhappy and stated he could not function. (Id.) Plaintiff was working in the laundry and stated he has to throw sheets and clothes frequently. (Id.) In January 2017, Dr. Ma had issued Plaintiff a job limitation noting that he should avoid prolonged walking and standing, and repetitively going up and down stairs because of his prior knee issues. (DX B, p. 71.) Dr. Ma also noted in the medical record that Plaintiff was still taking, among other pain medical, including aspirin, Tylenol and Ibuprofen (400 mg, three times a day), and that Plaintiff was not in acute distress, and walked with a normal gait, demonstrating no difficulty sitting up or down from a chair. (DX B, p. 85.)

40.     On March 7, 2017, Plaintiff visited Dr. Ma's office regarding a health care appeal that he filed complaining that his pain was not adequately controlled, and that he wanted his previously prescribed Tramadol medication back to his original dose of 100 mg twice a day. (DX B, p. 88.) Plaintiff further stated that he suffered a lot of pain and had trouble maintaining activities of daily living, since the discontinuation of Tramadol, however, upon further questioning Plaintiff revealed that he was still able to do activities, but argued that he has to fight through the pain in order to keep up to the normal level of his daily living. (Id.)

41.     At his previous visit (approximately a week earlier), Dr. Ma told Plaintiff that he should be on a tapering dose of Tramadol for a total of four to six weeks until discontinuation. Dr. Ma realized that he had only ordered Tramadol for two weeks, which Plaintiff had already finished. (DX B, p. 85.) Dr. Ma told Plaintiff he would put in another request for Plaintiff to get a continuation of the tapering dose of Tramadol for a total of four weeks with 50 mg twice a day for two weeks, and then 50 mg once a day for two weeks (DX B, p. 88.) At this visit, Dr. Ma also explained to Plaintiff the details of the California Department of Corrections and Rehabilitation guidelines for chronic non-cancer pain management. That non-cancer chronic pain (such as his) is not indicated for long-term narcotic medication management and that Tramadol is now considered one of the narcotic medications. (Id.) That was the reason the request for Plaintiff's Tramadol refill was denied. (Id.) Nonetheless, Dr. Ma informed Plaintiff that he would present Plaintiff's case to the Pain Management Committee and let him know the final decision. (Id.)

42.     On March 20, 2017, Plaintiff was scheduled for an appointment to discuss the Pain Management Committee decision of his case. (DX B, p. 96.) However, there was a mistake in scheduling, as the pain management committee did not meet until later in the afternoon. Dr. Ma informed Plaintiff that he would reschedule Plaintiff for another appointment in or two to discuss his pain management. (Id.)

///

8

43.     Dr. Ma presented Plaintiff's case to the pain management committee on March 20, 2017. (DX B, p. 93.) Dr. Ma presented Plaintiff's pain management referral to the pain management committee, indicating on the referral that Plaintiff wanted to be back on Tramadol, that Plaintiff had a history of knee pain and back pain, and that he had been on Tramadol until February 2017, when his refill of Tramadol was denied. (Id.) Dr. Ma also indicated that since then he had more knee and back pain and wanted back on Tramadol. The committee approved Plaintiff for Tramadol was not necessary at this point. (DX B, p. 94.)

44.     Plaintiff was scheduled to see Dr. Ma on March 29, 2017, but Plaintiff refused to attend his appointment. (DX B, p. 99.) Dr. Ma documented Plaintiff's refusal in a physician's order and also dictated a clinic note. (Id.)

45.     Dr. Ma saw Plaintiff on June 9, 2017, regarding his chronic medical issues, including a complaint of intermittent left knee pain. (DX B, p. 111.) A physical exam of vital signs and measurements was conducted. (Id.) The examination of his left knee showed mild crepitus (grating), but no swelling or deformity. (Id.) Plaintiff had normal range of motion, actively and passively, no muscle atrophy, and no joint line tenderness to palpation. (Id.) Valgus, varus and drawer tests were negative (for deformities or stress). (Id.) Plaintiff was advised to modify his activities to avoid exacerbation of the pain, and to take NSAIDS or Tylenol as needed. (Id.) Dr. Ma ordered a left knee x-ray. (Id.)

46.     Nurse Bergado noted on June 9, 2017, that Plaintiff was ambulatory but complaining of left knee pain. (DX B, p. 118.)

47.     The June 13, 2017 x-rays of Plaintiff's left knee showed mild degenerative changes of the knee, but no acute fracture, dislocation or joint effusion.

48.     On July 17, 2017, Nurse Lyndon noted Plaintiff had knee joint pain, left knee pain. (DX B, p. 112.) At the time, Plaintiff's medications included a keep on person Aspirin EC 81, mg. (DX B, p. 113.)

49.     On September 14, 2017, Plaintiff was seen by Dr. Ma, with Plaintiff's chief complaint being a drop in weight from 246 to 229 in the past six months. (DX B, p. 118-119) The etiology was unclear, but the rate of weight loss was not considered that rapid. (Id.) Dr. Ma ordered baseline lab tests. (DX B, p. 119.)

50.     Plaintiff had an office visit with Dr. Moghaddam, in March 2018. A note on Plaintiff's bilateral knee pain indicated that he exercised daily, did lots of squats and pushups, but stopped doing burpees. (DX B, p. 130-131.) There were no issues with ADL (activities of daily living), and it was documented that Plaintiff was able to work without any issues. (Id.) Dr. Moghaddam also conducted an examination of Plaintiff's left knee pain, which the doctor found to be unremarkable. Dr. Moghaddam educated Plaintiff on exercising. (Id.)

///

51.     Plaintiff was seen by Dr. Ma on April 6, 2018 for a follow appointment regarding Plaintiff's hypertension. (DX B, p. 132-133.) Plaintiff was encouraged to do moderate and regular exercise. (Id.)

52.     On August 6, 2018, Plaintiff was seen by Dr. Moghaddam for a follow up appointment concerning generalized body aches and pain. (DX B, p. 135-136.) Plaintiff reported that his leg pain was markedly improved after he discontinued his medication, simvastatin. (Id.) Plaintiff reported morning stiffness for up to 30 minutes in his knees, but he was able to do daily exercise. (Id.) An examination of Plaintiff was unremarkable, and he did not want any further workup. (Id.)

53.     On December 11, 2018, Dr. Ma saw Plaintiff for nose bleeds. (DX B, p. 138.)

54.     A few days later, on December 20, 2018, Plaintiff was seen by Dr. Ma for several medical complaints, including bilateral knee pain. (DX B, p. 139-141.) Plaintiff claimed he had not been on any narcotic medication since his Tramadol was discontinued in early 2017. (Id.) Although he complained of pain, Plaintiff was able to maintain his baseline activity of daily living. (Id.) In addition to his joint pain, the Plaintiff complained of intermittent facial and extremity swelling/edema. (Id.) Dr. Ma's assessment and plan for Plaintiff's pain was to check on a possible rheumatoid factor, and to test for lupus. (Id.)

55.     On January 7, 2019, Plaintiff was seen by Dr. Ma for body aches. (DX B, p. 145-146.) Dr. Ma had previously ordered an ANA (antinuclear antibodies) test, which reported positive, but the more specific tests for Lupus were negative. The ANA test was unclear, so another test was ordered to rule out rheumatoid arthritis. (Id.)

56.     Plaintiff had a rheumatology telemedicine consult with Dr. Kotha on April 18, 2019. Dr. Kotha ordered that Plaintiff be started on MTX (Methotrexate) to treat rheumatoid arthritis. (DX B, p. 150-151.)

57.     On April 30, 2019, Plaintiff was seen by Dr. Quidwai, as a follow up to his rheumatology telemedicine. An April 4, 2019 x-ray of Plaintiff's left knee was reviewed with him. The x-ray indicated tri-compartmental spurring, and a physical examination of Plaintiff's left knee showed minimal effusion on medial aspect of the knee joint, and negative Murphy, and anterior posterior drawer sings, as well as no instability of the patella. (DX B, p. 152.) Plaintiff was on methotrexate, and the plan was for the patient to follow up in six weeks. (Id.)

58.     On May 30, 2019, Plaintiff had another rheumatology telemedicine consult with Dr. Kotha, and Plaintiff's prescription of methotrexate was increased to 25 mg. (DX B, p. 152-154.)

59.     On August 29, 2019, Plaintiff had a third rheumatology telemedicine consult with Dr. Kotha. (DX B, p. 155-157.) The prescription for methotrexate was discontinued, and a prescription for sulfasalazine was discussed with Plaintiff. (Id.)

60.     On September 10, 2019, Plaintiff had another consultation with Dr. Kotha. (DX B, p. 158-160.)

61.     Plaintiff was seen on November 19, 2019, by Dr. Quidwai for low back pain and multiple joint pains. (DX B, p. 147.) Plaintiff was given acetaminophen 650 mg up to three times a day. Plaintiff was told to take ibuprofen as needed for pain control. (Id.)

ECF No. 38-2, pages 1-12.

In support of the Statement of Undisputed Facts, Defendant Ma offers the following exhibits:

DX A       Declaration of custodian of records Amber Crawford with attached non-confidential portions of Plaintiff's prison central file.  See ECF No. 38-3.

DX B       Declaration of custodian of record K. Bliss with attached portions of Plaintiff's medical file.  See ECF No. 38-4.

DX C       Pain Management care guide, part 3, relating to opioid therapy.  See ECF No. 38-5.

When bringing a motion for summary judgment, the moving party must submit a Statement of Undisputed Facts that cites to specific portions of "any pleading, affidavit, deposition… or other document relied upon to establish that fact." E.D. Cal. Local Rule 260(a). Opposing parties have two options in response. Opposing parties must reproduce movant's Statement of Undisputed Facts and deny any fact cited therein with reference to supporting evidence or file a Statement of Disputed Facts that cites to the record with any additional material facts that present a genuine issue. See E.D. Cal. Local Rule 260(b).

Plaintiff did not file an opposition or declaration disputing Defendant's Statement of Undisputed Facts. In light of Plaintiff's failure to comply with Local Rule 260(b), the Court deems Plaintiff to have admitted those facts not disputed by his submissions. See, e.g.. Fed. R. Civ. P. 56(e); Beard v. Banks, 548 U.S. 521, 527 (2006) ("[B]y failing specifically to challenge the facts identified in the defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in the [defendant's] statement."); Brito v. Barr, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July 15, 2020); see also Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004).

/ / /

/ / /

11

1          **III. STANDARDS FOR SUMMARY JUDGMENT**

2                   The Federal Rules of Civil Procedure provide for summary judgment or summary

3      adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file,

4      together with affidavits, if any, show that there is no genuine issue as to any material fact and that

5      the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

6      standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P.

7      56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of

8      the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See

9      Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the

10     moving party

11                      . . . always bears the initial responsibility of informing the district court of
                        the basis for its motion, and identifying those portions of "the pleadings,
12                      depositions, answers to interrogatories, and admissions on file, together
                        with the affidavits, if any," which it believes demonstrate the absence of a
13                      genuine issue of material fact.

14                   Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

15                   If the moving party meets its initial responsibility, the burden then shifts to the

16     opposing party to establish that a genuine issue as to any material fact actually does exist.  See

17     Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

18     establish the existence of this factual dispute, the opposing party may not rely upon the

19     allegations or denials of its pleadings but is required to tender evidence of specific facts in the

20     form of affidavits, and/or admissible discovery material, in support of its contention that the

21     dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

22     opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

23     affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

24     242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

25     Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

26     return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

27     (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

28     simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

1   taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

2   'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

3   claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

4   of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

5          In resolving the summary judgment motion, the court examines the pleadings,

6   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

7   See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

8   477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

9   court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

10  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

11  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

12  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

13  1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the

14  judge, not whether there is literally no evidence, but whether there is any upon which a jury could

15  properly proceed to find a verdict for the party producing it, upon whom the onus of proof is

16  imposed." Anderson, 477 U.S. at 251.

17

18                    **IV. DISCUSSION**

19          Defendant Ma contends judgment as a matter of law is appropriate because the

20  undisputed evidence shows he was not deliberately indifferent to Plaintiff's serious medical

21  needs.  Defendant Ma also argues he is entitled to qualified immunity.

22          A.      **Deliberate Indifference**

23          Plaintiff bases his claim on "deliberate indifference amounting to cruel and

24  unusual punishment through pain," i.e. medical needs in violation of the Eighth Amendment. ECF

25  No. 12, page 4. The treatment a prisoner receives in prison and the conditions under which the

26  prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel

27  and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan,

28  511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts

                                    13

1   of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102

2   (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

3   Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

4   "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy,

5   801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

6   two requirements are met: (1) objectively, the official's act or omission must be so serious such

7   that it results in the denial of the minimal civilized measure of life's necessities; and (2)

8   subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

9   inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

10  official must have a "sufficiently culpable mind."  See id.

11         Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

12  injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105;

13  see also Farmer, 511 U.S. at 837.  This applies to physical as well as dental and mental health

14  needs.  See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982), abrogated on other grounds by

15  Sandin v. Conner, 515 U.S. 472 (1995).  An injury or illness is sufficiently serious if the failure to

16  treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and

17  wanton infliction of pain."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled

18  on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc); see

19  also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness

20  are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2)

21  whether the condition significantly impacts the prisoner's daily activities; and (3) whether the

22  condition is chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122,

23  1131-32 (9th Cir. 2000) (en banc).

24         The requirement of deliberate indifference is less stringent in medical needs cases

25  than in other Eighth Amendment contexts because the responsibility to provide inmates with

26  medical care does not generally conflict with competing penological concerns.  See McGuckin,

27  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

28  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

1989).  The complete denial of medical attention may constitute deliberate indifference.  <u>See</u>

<u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical

treatment, or interference with medical treatment, may also constitute deliberate indifference.  <u>See</u>

<u>Lopez</u>, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate

that the delay led to further injury.  <u>See</u> <u>McGuckin</u>, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give

rise to a claim under the Eighth Amendment.  <u>See</u> <u>Estelle</u>, 429 U.S. at 106.  Moreover, a

difference of opinion between the prisoner and medical providers concerning the appropriate

course of treatment does not give rise to an Eighth Amendment claim.  <u>See</u> <u>Jackson v. McIntosh</u>,

90 F.3d 330, 332 (9th Cir. 1996).

In his motion for summary judgment, Defendant argues:

> Plaintiff's claims are refuted by the undisputed evidence which establishes that Dr. Ma tried a plethora of medical options for treating Plaintiff's knee pain. Part of Dr. Ma's medical responsibility is the exercise of independent medical judgment. Dr. Ma had no legal obligation to follow a previous medical plan, or to prescribe Plaintiff' the medication of his choice, especially since Plaintiff's medical records establish that Plaintiff was still having pain despite being prescribed Tramadol. Implicit in Plaintiff's interference argument is the suggestion that, once a doctor prescribed a certain treatment, Plaintiff is vested with some legal entitlement to that plan, no matter how effective. But it has long been held that, while inmates have a right to constitutionally adequate medical care, they do not have any right to choice of treatment. *See, e.g., Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).
>
> Plaintiff's medical records show that Dr. Ma ordered x-rays and other tests, provided Plaintiff with a brace to lessen Plaintiff's knee pain, suggested that Plaintiff move to a different assignment, referred Plaintiff for physical therapy and to a rheumatoid specialist, and provided Plaintiff with medication that Dr. Ma believed would better treat Plaintiff's pain. For all of these reasons, Dr. Ma is entitled to judgment as a matter of law.

ECF No. 38-1, pgs. 4-5

The Court agrees. Contrary to Plaintiff's allegations of no treatment and pain that

interferes with daily activities, Plaintiff's complaint concedes the fact that Ma has treated

Plaintiff. <u>See</u> ECF No. 12, pages 5-6. Ma proscribed leg braces, medical chronos, a cane, steroid

injections, and alternative methods for pain management in Plaintiff's left knee. <u>Id.</u> Defendant

submitted evidence of orders for Plaintiff to receive radiology services and laboratory testing for

Plaintiff's hypertension and hyperlipidemia. <u>See</u> ECF No. 38-4, pages 40-41; 59. Plaintiff's

1  allegations that Ma's treatments were a deliberate attempt to "substantiate prolonged years of

2  opioid use… to justify discontinuing the tramadol medication" are vague, conclusory, and

3  without citations to any evidence. ECF No. 12, page 7. Plaintiff claims that Ma's treatments do

4  not address the pain from Plaintiff's arthroscopic surgery and that Tramadol is the best option for

5  pain relief. See ECF No. 12, pages 10-11. However, opinions from a second doctor, Dr. Wedell,

6  resulted in treatment similar to those recommended or administered by Ma. Id. at 6; see also ECF

7  No. 38-4, page 20. Plaintiff's dissatisfaction that the steroid shots "proved to eliminate the pain

8  but after the effects has worn out" and that Ibuprofen has not proven as effective is insufficient

9  evidence for raising an Eighth Amendment claim based on medical necessity. ECF No. 12, page

10  7. Finally, Plaintiff does not show that Ma denied or delayed medical care, and Plaintiff offers no

11  showing of evidence that Ma's choice of treatments led to further injury.

12       **B.      Qualified Immunity**

13           Defendant Ma contends that qualifiedly immunity applies here because he did not

14  violate Plaintiff's clearly established Eighth Amendment rights. Ma argues:

15           The uncontroverted medical evidence establishes that Plaintiff's treating
    physicians, including Dr. Ma, reacted reasonably to Plaintiff's known medical
16   needs by conducting physical assessments, providing physical therapy, ordering
    tests, administering steroid injections, aspirating the knee, allowing Plaintiff to
17   wear tennis shoes, prescribing medically appropriate pain medication, and
    referring Plaintiff to an specialist. (DUF Nos. 9-75.) The law is not so clear that
18   reasonable medical professionals would have believed these actions to be
    unlawful. *See Hamby v. Hammond*, 821 F.3d 1085, 1093 (2016) (granting
19   qualified immunity when physicians pursued treatment decisions based on
    "legitimate medical opinions" previously held to be reasonable under the Eighth
20   Amendment).

21           ECF No. 38-1, page 9

22           Government officials enjoy qualified immunity from civil damages unless their

23  conduct violates "clearly established statutory or constitutional rights of which a reasonable

24  person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general,

25  qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

26  law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified

27  immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the

28  injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier

16

1    v. Katz, 533 U.S. 194, 201 (2001).  If a violation can be made out, the next step is to ask whether

2    the right was clearly established.  See id.  This inquiry "must be undertaken in light of the specific

3    context of the case, not as a broad general proposition . . . ."  Id.  "[T]he right the official is

4    alleged to have violated must have been 'clearly established' in a more particularized, and hence

5    more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable

6    official would understand that what he is doing violates that right."  Id. at 202 (citation omitted).

7    Thus, the final step in the analysis is to determine whether a reasonable officer in similar

8    circumstances would have thought his conduct violated the alleged right.  See id. at 205.

9           When identifying the right allegedly violated, the court must define the right more

10   narrowly than the constitutional provision guaranteeing the right, but more broadly than the

11   factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667 (9th

12   Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be sufficiently

13   clear that a reasonable official would understand [that] what [the official] is doing violates the

14   right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court

15   concludes that a right was clearly established, an officer is not entitled to qualified immunity

16   because a reasonably competent public official is charged with knowing the law governing his

17   conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff

18   has alleged a violation of a clearly established right, the government official is entitled to

19   qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct

20   did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see

21   also Saucier, 533 U.S. at 205.

22          The first factors in the qualified immunity analysis involve purely legal questions.

23   See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal

24   determination based on a prior factual finding as to the reasonableness of the government

25   official's conduct.  See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court

26   has discretion to determine which of the Saucier factors to analyze first.  See Pearson v. Callahan,

27   555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light

28   most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  See

17

1    Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

2          As discussed above, Plaintiff has a clearly established Eighth Amendment right of

3    medical necessity. The first part of the Saucier analysis asks whether this clearly established right

4    is sufficiently clear so that a reasonable officer would know their conduct violates this right.

5    Anderson, 483 U.S. at 640. Ma is entitled to qualified immunity as a matter of law if Ma violated

6    Plaintiff's Eighth Amendment right, but Ma believed his conduct did not violate Plaintiff's right.

7    As discussed above and as a matter of law, Ma did not violate Plaintiff's Eighth Amendment right

8    because Ma was not deliberately indifferent to Plaintiff's medical needs. Even if Ma violated

9    Plaintiff's rights, there is evidence Ma acted reasonably. Dr. Wedell's second opinion, orders for

10   lab results, and general treatment plans indicate Ma's conduct was reasonable and not deliberately

11   indifferent. ECF No. 12, page 6; see also ECF No. 38-4, page 20. Based on prior factual findings

12   viewed in the light most favorable to the Plaintiff, Ma passes the Saucier analysis and thus Ma is

13   entitled to qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201 (2001); Martinez, 323 F.3d

14   at 1184.

15

16                              **V. CONCLUSION**

17          Based on the foregoing, the undersigned recommends that Defendant's motion for

18   summary judgment, ECF No. 38, be granted.

19          These findings and recommendations are submitted to the United States District

20   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within 14 days

21   after being served with these findings and recommendations, any party may file written

22   objections with the court. Responses to the objections shall be filed within 14 days after service of

23   objections. Failure to file objections within the specified time may waive the right to appeal. See

24   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25

26   Dated: July 19, 2021

27                                        _____
                                          DENNIS M. COTA
28                                        UNITED STATES MAGISTRATE JUDGE

                                          18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28